214 P.3d 1133

Dason UDAC and Gwendolyn N. Udac, Trustee for the Alfredo Udac Revocable Living Trust, Plaintiffs–Appellees/Cross–Appellants,

v.

TAKATA CORPORATION, Defendant–Appellant/Cross–Appellee,

and

Hawaii Motors, Inc.; John Does 1–10; Jane Does 1–10; Doe Corporations 1–10; Doe Partnerships 1–10; Doe Entities 1–10; Roe "Non–Profit" Corporations 1–10; and Doe Governmental Agencies 1–10, Defendants–Appellees.

No. 28328.

Intermediate Court of Appeals of Hawai'i.

Aug. 19, 2009.

Kenneth K. Fukunaga (Lois H. Yamaguchi with him on the briefs) of Fukunaga Matayoshi Hershey & Ching, LLP, Honolulu, and Kenneth S. Geller of Mayer Brown LLP (admitted pro hac vice), Washington, DC, for Defendant–Appellant/Cross–Appellee.

Jeffrey L. Fisher (admitted pro hac vice) of Davis Wright Tremaine LLP, Seattle, WA, (Steven K. Hisaka and Gail Y. Cosgrove of Hisaka Yoshida & Cosgrove, Honolulu, and Dwayne S. Lerma and Jo Anne E. Goya of Lerma & Goya, Hilo, on the briefs), for Plaintiffs–Appellees/Cross–Appellants.

John T. Komeiji and Gary S. Suganuma (Watanabe Ing & Komeiji LLP), Honolulu, on the brief for Amicus Curiae Product Liability Advisory Council, Inc.

Sarah O. Wang and Melanie Mito May (Marr Hipp Jones & Wang, LLLP), Honolulu, and Alan E. Untereiner (admitted pro hac vice) (Robbins Russell Englert Orseck & Untereiner LLP), Washington, DC, on the brief for Amicus Curiae Association of International Automobile Manufacturers and Alliance of Automobile Manufacturers.

WATANABE, Acting C.J., FOLEY and FUJISE, JJ.

Opinion of the Court by FOLEY, J.

Defendant–Appellant/Cross–Appellee Takata Corporation (hereinafter, Defendant or Takata) appeals from the Second Amended Judgment filed on November 28, 2006, in the Circuit Court of the Third Circuit (circuit court).[1] Following a jury trial, the circuit court entered judgment in favor of:

(1) Plaintiff–Appellee/Cross–Appellant Dason Udac (Dason) and against Takata on Dason's claims for negligence, product liability, and punitive damages;

(2) Plaintiff–Appellee/Cross–Appellant Gwendolyn N. Udac, Trustee of the Alfredo Udac Revocable Living Trust, (Gwendolyn) (Gwendolyn and Dason are collectively referred to as the Udacs) and against Takata on Alfredo Udac's claims for negligent infliction of emotional distress and loss of consortium/pecuniary losses;

(3) Takata and against the Udacs on the Udacs' claims of intentional infliction of emotional distress, failure to warn, breach of warranty, and alleged manufacturing defects; and

(4) Defendant–Appellee Hawaii Motors, Inc.[2] (Hawaii Motors) and against the Udacs on the Udacs' claims of failure to warn, breach of warranty, alleged manufacturing defects, negligence, product liability, negligent infliction of emotional distress, intentional infliction of emotional distress, loss of consortium/pecuniary losses, and punitive damages.

On appeal,[3] Takata contends the circuit court erroneously

(1) excluded expert testimony by Robert Douglas Banks, M.D. (Dr. Banks);

(2) admitted into evidence applications for seatbelt-buckle patents filed by Takata on September 7, 1984 (TK–52 patent) and April 29, 1987 (A–95 patent) (collectively referred

1. The Honorable Glenn S. Hara presided.

2. The Udacs' claims against Hawaii Motors, Inc. were terminated on September 14, 2005 on summary judgment.

3. Takata's opening brief and the Udacs' answering brief fail to comply with Hawai'i Rules of

Appellate Procedure (HRAP) Rule 28(b)(3) in failing to include in the statement of the case "record references supporting *each statement of fact* or mention of court ... proceedings." (Emphasis added.) Counsel for both parties are warned that future non-compliance with HRAP Rule 28(b)(3) may result in sanctions against them.

to as the TK–52 and A–95 patents or the patents);

(3) admitted into evidence Nissan Design Specifications for the 1992 Nissan Pathfinder (1992 NDS);

(4) instructed the jury on negligent failure to warn and the latent-danger theory of product defect;

(5) denied the portion of "Defendant Takata Corporation's Motion for Judgment as a Matter of Law, at Close of Evidence" (Takata's JMOL Motion) in which Takata requested that the circuit court enter judgment as a matter of law (JMOL) in Takata's favor because the Udacs did not present sufficient evidence for their false-latch theory of defect;

(6) denied the portion of Takata's JMOL Motion in which Takata requested that the circuit court enter JMOL in Takata's favor because the jury's punitive damages award was based on insufficient evidence; and

(7) denied the portion of "Defendant Takata Corporation's Renewed Motion for Judgment as a Matter of Law and/or for New Trial and/or for Remittitur" (Takata's Renewed JMOL Motion) in which Takata requested that the circuit court enter JMOL in Takata's favor because the jury's $12,500,000 punitive damages award was excessive under Hawai'i law and the federal due process clause.

The Udacs cross-appeal from the (1) "Order Granting in Part and Denying in Part Plaintiffs' Motion for Award of Costs and Prejudgment Interest and for Form of Judgment Filed on January 27, 2006," filed on April 19, 2006 (Order Granting/Denying Motion for Prejudgment Interest) and (2) Second Amended Judgment. The Udacs contend the circuit court erroneously failed to award them prejudgment interest on (1) compensatory damages from the date of the accident and (2) the punitive damages award.

We vacate and remand.

## I.

On the morning of October 8, 2000, Dason was driving himself and a passenger, Ikaika Viernes (Ikaika), in a 1987 Nissan Pathfinder (hereinafter referred to alternatively as the Pathfinder or the vehicle), traveling southbound on Route 11 on the Island of Hawai'i, when the Pathfinder left the road going approximately 55 miles per hour. The Pathfinder struck a lava rock outcropping and eventually rolled, ending up about 186 feet away from the point of impact. At some point, both Dason and Ikaika were ejected from the Pathfinder. Dason suffered a spinal cord injury that rendered him a paraplegic. There were no witnesses to the accident, and Dason and Ikaika testified at trial that they had no memory of the accident.

On July 29, 2002, Dason and his father, Alfredo Udac,[4] filed a complaint against Takata and Hawaii Motors, alleging negligence (Count I), product liability (Count II), breach of express and/or implied warranties (Count III), negligent/intentional infliction of emotional distress (Count IV), loss of consortium/pecuniary losses (Count V), and punitive damages (Count VI). The Udacs alleged that the Pathfinder's driver-side seatbelt, Model No. TK–821, which Takata had designed and manufactured, failed to restrain Dason during the accident, proximately causing Dason's injuries.

A jury returned a special verdict, awarding the Udacs $6.85 million in compensatory damages and $12.5 million in punitive damages. The jury also found that Dason was 35% at fault and Takata was 65% at fault.

In accordance with Hawai'i Rules of Civil Procedure (HRCP) Rule 58[5] and pursuant to

---

**4.** Alfredo Udac passed away during the pendency of the lawsuit, and on November 28, 2006, the circuit court entered an order substituting Gwendolyn as Trustee of the Alfredo Udac Revocable Living Trust "as party Plaintiff" in place of Alfredo.

**5.** HRCP Rule 58 provides in relevant part: "Unless the court otherwise directs and subject to the provisions of Rule 54(b), judgment upon the verdict of a jury shall be entered forthwith by the clerk; but the court shall direct the appropriate judgment to be entered upon a special verdict or upon a general verdict accompanied by answers to interrogatories returned by a jury pursuant to Rule 49."

the jury's verdict, the circuit court entered a Judgment on April 19, 2006 (first Judgment) in favor of the Udacs on all claims, except breach of express and/or implied warranties, and on May 31, 2006 entered a First Amended Judgment. On November 28, 2006, the circuit court entered a Second Amended Judgment, in which the court awarded the Udacs special and general damages totaling $4,452,500 (the circuit court's reduction of the jury's money verdict took into account the jury's finding that Dason was 35% at fault); awarded Dason punitive damages of $12,500,000; and awarded the Udacs reasonable costs totaling $81,213.69. The circuit court ordered prejudgment interest to accrue on all of the compensatory damages and costs awarded at the statutory rate allowed by law from December 22, 2005 to the entry of the first judgment on April 19, 2006 and post-judgment interest to accrue on all sums awarded, including punitive damages, at the statutory rate allowed by law from April 19, 2006 until the date the Second Amended Judgment is satisfied.

## II.

### A. Expert Testimony

Hawaii Rules of Evidence (HRE) Rule 702 sets forth the requirements for qualification of an expert witness:

> Rule 702 Testimony by experts. If scientific, technical, or other specialized knowledge will assist the trier of fact to understand the evidence or to determine a fact in issue, a witness qualified as an expert by knowledge, skill, experience, training, or education may testify thereto in the form of an opinion or otherwise. In determining the issue of assistance to the trier of fact, the court may consider the trustworthiness and validity of the scientific technique or mode of analysis employed by the proffered expert.

■■■ "[W]hether a witness qualifies as an expert is a matter addressed to the sound discretion of the trial court, and such determination will not be overturned unless there is a clear abuse of discretion." *Larsen v. State Sav. & Loan Ass'n*, 64 Haw. 302, 304, 640 P.2d 286, 288 (1982). "In applying [HRE

Rule 702], the trial court must determine whether the expert's testimony is (1) relevant, and (2) reliable." *Ass'n of Apt. Owners of Wailea Elua v. Wailea Resort Co.*, 100 Hawai'i 97, 117, 58 P.3d 608, 628 (2002). "The trial court's relevancy decision under HRE 702 is reviewed *de novo*." *State v. Keaweehu*, 110 Hawai'i 129, 137, 129 P.3d 1157, 1165 (App.2006). "The trial court's determination as to reliability is reviewed under the abuse of discretion standard." *Wailea Elua*, 100 Hawai'i at 117, 58 P.3d at 628.

### B. Admissibility of Evidence

Different standards of review must be applied to trial court decisions regarding the admissibility of evidence, depending on the requirements of the particular rule of evidence at issue. When application of a particular evidentiary rule can yield only one correct result, the proper standard for appellate review is the right/wrong standard.

Where the evidentiary ruling at issue concerns admissibility based upon relevance, under [HRE] Rules 401 and 402, the proper standard of appellate review is the right/wrong standard.

Evidentiary decisions based on HRE Rule 403, which require a judgment call on the part of the trial court, are reviewed for an abuse of discretion. The trial court abuses its discretion when it clearly exceeds the bounds of reason or disregards rules or principles of law or practice to the substantial detriment of a party litigant.

*Tabieros v. Clark Equip. Co.*, 85 Hawai'i 336, 350–51, 944 P.2d 1279, 1293–94 (1997) (internal quotation marks, citations, and brackets omitted; block quote format changed) (quoting *State v. Arceo*, 84 Hawai'i 1, 11, 928 P.2d 843, 853 (1996)).

### C. Admission of Opinion Evidence (Expert Testimony)

■■■ "Generally, the decision whether to admit expert testimony rests in the discretion of the trial court. To the extent that the trial court's decision is dependant upon interpretation of court rules, such interpretation is a question of law, which this court reviews de novo." *Barcai v. Betwee*, 98 Hawai'i 470,

479, 50 P.3d 946, 955 (2002) (citations omitted).

### D. Jury Instructions

"The standard of review for a trial court's issuance or refusal of a jury instruction is whether, when read and considered as a whole, the instructions given are prejudicially insufficient, erroneous, inconsistent, or misleading." *Stanford Carr Dev. Corp. v. Unity House, Inc.*, 111 Hawai'i 286, 297, 141 P.3d 459, 470 (2006) (internal quotation marks and citation omitted). Generally, instructions that are found to be an erroneous articulation of the law raise a presumption that they were harmful. *Turner v. Willis*, 59 Haw. 319, 326, 582 P.2d 710, 715 (1978). The presumption can be overcome however, if it "affirmatively appears from the record as a whole that the error was not prejudicial." *Id.*

The boundaries of the trial judge's discretion in informing the jury of the law applicable to the current case are defined "by the obligation to give sufficient instructions and the opposing imperative against cumulative instructions." *Tittle v. Hurlbutt*, 53 Haw. 526, 530, 497 P.2d 1354, 1357 (1972). Refusing to give an instruction relevant under the evidence that correctly states the law is an error if the point has not been adequately and fully covered by other instructions. *Sherry v. Asing*, 56 Haw. 135, 144, 531 P.2d 648, 655 (1975).

### E. Judgment as a Matter of Law

It is well settled that a trial court's rulings on motions for judgment as a matter of law are reviewed *de novo*.

When [the appellate court reviews] the granting of a motion for judgment as a matter of law, [the appellate court applies] the same standard as the trial court.

A motion for judgment as a matter of law may be granted only when after disregarding conflicting evidence, giving to the non-moving party's evidence all the value to which it is legally entitled, and indulging every legitimate inference which may be drawn from the evidence in the non-moving party's favor, it can be said that there is no evidence to support a jury verdict in his or her favor.

*Miyamoto v. Lum*, 104 Hawai'i 1, 6–7, 84 P.3d 509, 514–15 (2004) (internal citations omitted).

*Aluminum Shake Roofing, Inc. v. Hirayasu*, 110 Hawai'i 248, 251, 131 P.3d 1230, 1233 (2006) (brackets in original omitted).

### F. Award of Punitive Damages

An "[a]ward or denial of punitive damages is within the sound discretion of the trier of fact. Absent a clear abuse of discretion, we will not reverse a trier of fact's decision to grant or deny punitive damages." *Ditto v. McCurdy*, 86 Hawai'i 84, 91, 947 P.2d 952, 959 (1997) (internal quotation marks and citations omitted).

### III.

#### A. Takata's Appeal

##### 1. Dr. Banks's testimony

Takata argues the circuit court erred by excluding Dr. Banks's testimony that the results of his "Exemplar Surrogate Study" (hereinafter surrogate study) showed no "loading marks"[6] on Dason's seatbelt (the seatbelt) where such marks should have been

---

6. The Pathfinder had a three-point seatbelt system that when engaged was configured as follows: the belt, or webbing, emerged from a retractor located to the left of the driver's seat, proceeded straight up and passed through a D-ring attached to the B-pillar (a vertical column in the frame of the vehicle) over the driver's left shoulder, ran down across the driver's chest through a slot in the tongue (which inserted into the latch plate of the buckle body that was mounted on a buckle stalk bolted to the floor of the vehicle on the right of the driver's seat), proceeded back across the driver's lap, and was sewn to an anchor plate bolted to the floor on the left side of the driver's seat.

"Loading" is the force exerted by an occupant onto a seatbelt during an accident and is measured by the occupant's body weight times the amount of G forces experienced by the occupant. "Loading marks" are marks on the webbing of a seatbelt assembly caused during an accident by stress placed on the webbing at contact points where the seatbelt passes through the D-ring and the tongue.

if Dason had been wearing the seatbelt at the time of the crash (surrogate-study results).[7] Takata also maintains the circuit court erred by precluding Dr. Banks from testifying that certain bruises and marks on various parts of Dason's body were not caused by the seatbelt, but by Dason's ejection from the vehicle through the sunroof.

HRE Rule 403 provides for the exclusion of relevant evidence in some circumstances:

> Rule 403 Exclusion of relevant evidence on grounds of prejudice, confusion, or waste of time. Although relevant, evidence may be excluded if its probative value is substantially outweighed by the danger of unfair prejudice, confusion of the issues, or misleading the jury, or by considerations of undue delay, waste of time, or needless presentation of cumulative evidence.

In *State v. McCrory*, 104 Hawai'i 203, 87 P.3d 275 (2004), the Hawai'i Supreme Court stated:

> In applying the abuse of discretion standard of review to the admissibility of relevant evidence under HRE Rule 403, this court has acknowledged that the determination of the admissibility of relevant evidence under HRE 403 is eminently suited to the trial court's exercise of its discretion because it requires a cost-benefit calculus and a delicate balance between probative value and prejudicial effect.

*Id.* at 207, 87 P.3d at 279 (internal quotation marks and citation omitted).

### a. Marks on seatbelt webbing

At trial, the Udacs' witness, David Allen Renfroe, Ph.D., (Dr. Renfroe) testified that he examined the webbing of the seatbelt and based on marks he found there, among other things, he believed Dason was wearing his seatbelt at the time of the accident. Dr. Renfroe testified that numerous loading marks on the seatbelt webbing were caused when Dason's body "loaded" the seatbelt during the accident, not by normal wear and tear.

When Takata's counsel asked Dr. Banks whether he had conducted his surrogate study to examine seatbelt marks, the Udacs' counsel, Steven Hisaka (Hisaka), objected that the testimony would be (1) cumulative of testimony given by Takata's seatbelt expert, Eddie R. Cooper (Cooper), and (2) outside the scope of Dr. Banks's expert qualifications because Dr. Banks had been "identified as a biomechanical expert and not an expert on ... seat belts and seat belt assembly system[s]."

Takata's counsel argued that Dr. Banks's testimony regarding the results of his surrogate study would show that "one of the marks found by [Dr.] Renfroe on the seat belt webbing ... is in the wrong location for a person of similar size and height as Dason Udac if you put a surrogate in ... [a] substantially similar vehicle." Takata's counsel also pointed out that Dr. Banks would give his opinion from a biomechanical perspective[8] and distinguished the proffered testimony from Cooper's testimony, which, counsel argued, had concerned the cause of marks on the seatbelt webbing considered from a "performance" standpoint.

The circuit court sustained Hisaka's objection, but did not explain upon what grounds. We conclude that neither ground raised in Hisaka's objection should have precluded Dr. Banks's testimony.

#### (i) Cumulative testimony

In *State v. Pulse*, 83 Hawai'i 229, 247, 925 P.2d 797, 815 (1996), the Hawai'i

---

7. Dr. Banks described the surrogate study in a pre-trial report:
   On February 28, 2005, BRC [Dr. Banks' employer, Biodynamic Research Corporation] conducted an exemplar-surrogate inspection using a human surrogate (matched for height and weight to [Dason]) and two matched vehicles. The purpose of the inspection was to understand and document seatbelt webbing/hardware interactions that would be expected if the belt had been worn during the crash.

8. At trial, Dr. Banks testified that he followed five steps in conducting his injury causation analysis: (1) vehicle motion or vehicle dynamics, (2) occupant motion or occupant kinematics, (3) biomechanics, (4) injury potential/injury analysis, and (5) review of medical records. Dr. Banks testified that "[b]iomechanics is the application of the science of mechanics to biological systems." In this case, the biomechanical system was a human being.

Supreme Court held that "[i]n order for evidence to be considered 'cumulative' for HRE 403 purposes, it must be substantially the same as other evidence that has already been received." In *State v. Klafta,* 73 Haw. 109, 115, 831 P.2d 512, 516 (1992), the Hawai'i Supreme Court held that where witnesses had observed many of the same things, but also some different things, the Circuit Court of the First Circuit did not abuse its discretion in admitting their testimony.

In *United States v. Kizeart,* 102 F.3d 320 (7th Cir.1996),[9] the United States Court of Appeals for the Seventh Circuit stated that "[e]vidence is 'cumulative' when it adds very little to the probative force of the other evidence in the case, so that if it were admitted its contribution to the determination of truth would be outweighed by its contribution to the *length of trial,* with all the potential for confusion, as well as prejudice to other litigants, who must *wait longer* for their trial, that a *long trial* creates." *Id.* at 325 (emphases added) (quoting *United States v. Williams,* 81 F.3d 1434, 1443 (7th Cir. 1996)).

We agree that when determining whether proffered evidence is cumulative, a trial court must weigh how much time it would take to present such evidence relative to the evidence's probative value. *McCrory,* 104 Hawai'i at 207, 87 P.3d at 279. Applying the foregoing principles for determining whether evidence is cumulative, we conclude that Dr. Banks's testimony was not cumulative and therefore the circuit court erred in precluding Dr. Banks from testifying.

#### (a) Differences in testimonies

At trial, Cooper testified that he inspected the seatbelt Dason allegedly wore at the time of the accident. When asked, "What were your findings based on your inspection of the sliding latch plate[10] of the subject seat belt?," Cooper responded, "The subject seat belt latch—latch plate load bearing surface have [sic] marks that I would characterize as typical and normal wear.... Nothing on that surface that is indicative or characteristic of load transfer from the webbing." Cooper testified that if the seatbelt had been loaded in this case, the "particular weave pattern" of the seatbelt webbing would have been transferred to the surface of the sliding latch plate.

Cooper further testified that "marks on the subject D ring were consistent with what I found in the survey on vehicles that have not, to the best of our knowledge, been in any kind of accident. Therefore, you would not expect the belt to be loaded. Therefore, these are marks associated with normal wear and tear as opposed to loading."

Read in context, it is clear that Cooper's testimony concerned marks on the sliding latch plate and D-ring, not the webbing, of the seatbelt involved in this case.

Cooper did testify about where one would expect to find "webbing grabber" or "emergency locking retractor" marks on a seatbelt if fourteen hundred pounds of force were distributed throughout the belt system:

> Q [Takata's counsel]. And at the time of impact as I've noted Dr. Woolley has calculated approximately 12 Gs of force, in terms of load can you calculate a load that would have been produced assuming 12 Gs of force was in fact the G force at impact?
>
> A [Cooper]. Well, 12 Gs will be reacting on the vehicle and the occupants will be moving relative to the vehicle. If the restraint system engaged the occupant, it would resist the same level of force. So the force calculation would be simply 12 times the weight of the occupant minus some load that would obviously go into the seat because he would have to be sliding along the seat interacting with other components in the vehicle.

---

**9.** *Kizeart* was decided, in part, pursuant to Federal Rules of Evidence (FRE) Rule 403, 102 F.3d at 325, which is identical to HRE Rule 403. FRE Rule 403 provides that "[a]lthough relevant, evidence may be excluded if its probative value is substantially outweighed by the danger of unfair prejudice, confusion of the issues, or misleading the jury, or by considerations of undue delay, waste of time, or needless presentation of cumulative evidence."

**10.** At trial, Cooper referred to the tongue (*see supra* text accompanying note 6) as the "sliding latch plate."

So the total load is in excess of—to make the calculation easy—fourteen hundred pounds. That would be distributed through the belt system, the reaction points that we've been talking about in the seat itself.

Q. When you say the fourteen hundred pounds would be distributed throughout the belt system, could you be a little bit more specific on how that load is distributed?

A. Well, the collision would be to the front right of the vehicle, so the occupant would tend to continue forward relative to the vehicle. And so the torso and the lower portion of the body would load up, the torso section of the belt and the lap portion of the belt.

The torso and lap inboard load would be reacted through the latch plate through that load bearing surface into the buckle. The outboard side of the lap would react to the floor and the torso would react to the D ring.

Q. Based on that scenario, where would you expect to find load marks?

A. On the latch plate load bearing surface.

Q. Where would you expect to find the webbing grabber or emergency locking retractor marks?

A. Typically when you sit in one of these vehicles, the D ring itself is 70 to 80 inches from the outboard anchorage point. It's about 30 or so inches from the D ring down to the bottom of the retractor. So you'd expect to see them in the one hundred plus range on the webbing.

In their answering brief, the Udacs cite to the above testimony by Cooper in support of their assertion that "Takata *did*, in fact, ask for Mr. Cooper's testimony about '*where* [he] would ... expect to find load marks' 'distributed throughout the belt system' had Dason been wearing his [seatbelt], including *where* Mr. Cooper would expect to find marks on the webbing resulting from the emergency locking retractor that prevents the safety belt from unspooling in an accident." (Emphases in original.) We disagree with the Udacs' characterization. Read in context, it is clear that Cooper's testimony amounted to

nothing more than a hypothesis on where "webbing grabber or emergency locking retractor marks" would have been found where, for example, fourteen hundred pounds of force had impacted a vehicle. The testimony did not relate to the facts of this case as directly as the Udacs contend.

In summary, the record reveals enough differences between Dr. Banks's proffered testimony and Cooper's testimony so that the former would not have been cumulative of the latter. If Dr. Banks's proffered testimony concerned the results of his surrogate study, which was based on biomechanics and offered specifically to rebut the testimony of Dr. Renfroe that a mark on the seatbelt webbing was not caused when Dason's body loaded the seatbelt, it was distinguishable from Cooper's testimony, which concerned where a seatbelt's "webbing grabber" or "emergency locking retractor" would create marks on the seatbelt webbing in a hypothetical situation.

The Udacs argue in their answering brief that Dr. Banks's proffered testimony was cumulative of Cooper's testimony because "Takata offered Mr. Cooper, not Dr. Banks, as its [seatbelt] expert." The Udacs provide no authority for the notion that a party may call only one expert at trial to testify as to the safety of a seatbelt, and we find none.

### (b) Consideration of time

There is no evidence in the record on appeal that the circuit court attempted to ascertain how long it would take Dr. Banks to testify about the results of his surrogate-study. There is also no indication that the circuit court considered limiting the amount of time in which Dr. Banks could testify or balanced whether the probative force of Dr. Banks's testimony would be outweighed by its contribution to the length of the trial, its potential for confusion, or its prejudice to other litigants who must wait longer for their trial. The circuit court erred in excluding Dr. Banks's testimony on cumulative evidence grounds.

### (ii) Scope of expert qualification

██ Takata argues that Dr. Banks was qualified to testify about the surrogate-study results.

At trial, the Udacs objected that Dr. Banks's proffered testimony was beyond the scope of the doctor's qualifications. In their answering brief, the Udacs argue that although Dr. Banks was qualified to testify as a biomechanical expert, he was not qualified *as a [seatbelt] expert* and so could not testify as to the absence of marks on the seatbelt webbing where such marks would have been if Dason had been wearing his seatbelt at the time of the crash. (Emphasis in original.)

■ "[A] witness may qualify as an expert if he or she possesses a background in any one of the five areas listed under HRE Rule 702 [11]: knowledge, skill, experience, training, *or* education." *Nielsen v. Am. Honda Motor Co.*, 92 Hawai'i 180, 188, 989 P.2d 264, 272 (App.1999) (emphasis in original; footnote added).

In *Estate of Klink ex rel. Klink v. State*, 113 Hawai'i 332, 152 P.3d 504 (2007), the Hawai'i Supreme Court stated the following with regard to the qualifications necessary for an expert witness:

> [I]t is not necessary that the expert witness have the highest possible qualifications to testify about a particular manner [sic], but the expert witness must have such skill, knowledge, or experience in the field in question as to make it appear that his opinion or inference-drawing would probably aid the trier of fact in arriving at the truth. Once the basic requisite qualifications are established, the extent of an expert's knowledge of subject matter goes to the weight rather than the admissibility of the testimony.

*Id.* at 352, 152 P.3d at 524 (ellipses omitted) (quoting *State v. Wallace*, 80 Hawai'i 382, 419 n. 37, 910 P.2d 695, 732 n. 37 (1996)).

*Association of Apt. Owners of Wailea Elua v. Wailea Resort Co.* concerned an action to recover costs associated with drainage pipe repair. 100 Hawai'i at 100, 58 P.3d at 611. The Hawai'i Supreme Court held that the trial court had not abused its discretion in qualifying Wailea Resort Co.'s expert and

accepting the expert's testimony that inorganic chemicals from the resort's golf course had not caused pipes at the resort to corrode. *Id.* at 117–18, 58 P.3d at 628–29. The supreme court noted that the expert had earned degrees in metallurgy and engineering and had had some work experience involving corrosion issues in water pipes. *Id.* at 117, 58 P.3d at 628.

In *Yap v. Controlled Parasailing of Honolulu, Inc.*, 76 Hawai'i 248, 254, 873 P.2d 1321, 1327 (1994), the Hawai'i Supreme Court held that a witness was qualified to testify as an expert regarding the need to include a restraining device on the chair of a parasail. The supreme court pointed out that although the witness had not designed parasails, he held a doctorate in mechanical engineering, with a major in fluid engineering, and had expertise in "the study of aerodynamic devices, spotting problems, and finding solutions." *Id.* The supreme court stated that the fact that the witness had not actually designed a parasail should have gone to the weight of his testimony and not to its admissibility and that the witness's "skill, knowledge, and experience in the area of 'troubleshooting' was such that his opinions or inference-drawing would probably aid the trier of fact in arriving at the truth." *Id.*

In *Larsen v. State Sav. & Loan Ass'n*, the Hawai'i Supreme Court held that a witness was qualified to testify as to the defective nature and design of a champagne bottle stopper where the witness had a bachelor's degree in mechanical engineering, which gave him a background in design, heat transfer, and engineering; had a master's degree and Ph.D. in fluid mechanics, heat transfer, and mathematics; had experience in designing pressurized containers, such as nuclear reactors, energy storage vessels, and recoilless rifles through his employment as an engineer and work in a military research laboratory; had been a consultant for two law firms on three product-liability cases in-

---

11. HRE Rule 702 provides in relevant part:

Rule 702 Testimony by Experts. If scientific, technical, or other specialized knowledge will assist the trier of fact to understand the evidence or to determine a fact in issue, a witness qualified as an expert by knowledge, skill, experience, training, or education may testify thereto in the form of an opinion or otherwise.

volving the spontaneous ejection of stoppers from champagne bottles; and had conducted experiments to study the ejection of plastic champagne stoppers, the effect of temperature on the pressure in the champagne bottles, and the relationship between the temperature of the liquid and the temperature of the outside bottle surface. 64 Haw. at 305, 640 P.2d at 288–89. The supreme court stated:

> Although [the witness] has no experience in the manufacturing or design of champagne, champagne bottles, or stoppers, the subject matter of the case falls within his overall background. In addition, his experiments on champagne bottles and stoppers and his consulting work gave him experience with the specific subject of the case. We hold that [the witness] was qualified to testify as an expert on the issues of whether the champagne bottle and stopper were defective and whether the champagne was negligently transported, stored, and cared for. His lack of experience should have gone to the weight rather than the admissibility of the testimony.

*Id.* at 305, 640 P.2d at 289 (citations omitted).

In contrast, *Craft v. Peebles,* 78 Hawai'i 287, 290, 893 P.2d 138, 141 (1995), involved an action brought by a patient who had received silicone breast implants against the implant manufacturer and the physician who performed the procedure. The Hawai'i Supreme Court held that the circuit court did not abuse its discretion in limiting a chemical engineer's testimony to the area of chemical engineering and preventing the engineer from testifying as to the effects of silicone on the human body with regard to "migration," the process by which free silicone travels through the body. *Id.* at 293 n. 7 & 301–02, 893 P.2d at 144 n. 7 & 152–53. The supreme court noted that the engineer had no formal education or training in the interaction of silicone gel with the human body or physiology, biophysics, biomedical engineering, cytology, biology, microbiology, medicine, or any medical-related subject. *Id.* at 302, 893 P.2d at 153.

In the instant case, it is undisputed that the circuit court qualified Dr. Banks as a biomechanical expert. At trial, Dr. Banks testified that he was a physician with a medical degree from the University of Toronto and an engineer with a degree in Civil Engineering from the Royal Military College of Canada. He had completed a residency with the United States Navy in aerospace medicine, the only medical specialty that studies and practices biomechanics or injury analysis. Prior to trial in this case, Dr. Banks had been qualified by trial courts as a biomechanical expert. By the time of trial, he had consulted on approximately one thousand motor vehicle cases, two to three hundred of which involved roll-overs, and had taught courses in biomechanics and injury causation analysis.

Based on his credentials and experience, we conclude that Dr. Banks was more like the experts in *Wailea Elua, Yap,* and *Larsen* than the expert in *Craft.* In coming to this conclusion, we note that in *Wailea Elua,* the Hawai'i Supreme Court did not hold that the expert had to be an expert in pipe corrosion to testify as to what had not caused pipes to corrode. 100 Hawai'i at 117, 58 P.3d at 628. Similarly, in *Yap,* the supreme court held that although the witness had not designed parasails, he could testify as to the need for a restraining device on the chair of a parasail. 76 Hawai'i at 254, 873 P.2d at 1327. In *Larsen,* the supreme court held that the witness did not need to be an expert in the manufacturing or design of champagne, champagne bottles, or stoppers to testify as to a defect in the stopper of a champagne bottle. 64 Haw. at 305, 640 P.2d at 289. Similarly, in this case, Dr. Banks was not required to be a seatbelt expert to testify about his surrogate-study results.

Given the foregoing, we hold that Dr. Banks was qualified to testify about the results of his surrogate study. Any lack of expertise that he may have had should have gone to the weight rather than the admissibility of his testimony.

### (iii) Result

The circuit court abused its discretion by precluding Dr. Banks from rebutting, based on the results of the surrogate study, Dr. Renfroe's testimony that one of the marks on the seatbelt webbing was caused when Da-

son's body loaded the seatbelt during the accident.

### b. Marks and bruises on Dason's body

Takata argues the circuit court erred by prohibiting Takata from questioning Dr. Banks about alleged bruises and marks on Dason's body that Dason's brother, Sheldon Paul Udac (Paul), testified were caused by the seatbelt during the accident.

Takata's counsel asked Paul during a deposition if Paul had noticed any "bruises on [Dason] at all when . . . you saw [Dason] in the hospital?", and Paul answered, "I can't remember." At trial, Paul testified that at Queen's Hospital, he never saw any bruises on Dason's upper torso because Dason's upper torso was always clothed. He further testified that when he was going through caregiver training with Dason at the Rehabilitation Hospital of the Pacific sometime before November 15, 2000, he saw Dason unclothed and saw "black marks on [Dason's] left shoulder" that were "[b]lack marks or burns from the seat belt." When asked on direct examination, "It appeared to you to be burns from the seat belt?", Paul responded, "From the seat belt. On his shoulder, I think his left hip, and on his stomach." On cross-examination, Paul testified the bruises on Dason's shoulder had actually been "purplish" and looked fresh to him.

At trial, Dr. Banks testified that a CD image (Takata's Exhibit 5818 in evidence) of abrasions and scratches on Dason's upper back matched a piece of broken metal on the roof of the Pathfinder, suggesting that the abrasions and scratches had resulted from Dason's impact with the sun roof as he was ejected from the vehicle. Dr. Banks testified that a CD image (Takata's Exhibit 5831 in evidence) showed suture marks from the placement of a "subclavian catheter or subclavian line" in Dason's front, left shoulder. Dr. Banks testified that the marks were from retention sutures that secured the catheter an inch or two below the mid-point of Dason's collar bone.

On direct examination, when Takata's counsel began to question Dr. Banks about the alleged bruises and marks on Dason's body for the purpose of rebutting Paul's testimony, Hisaka and the Udacs' other counsel, Dwayne Lerma (Lerma), objected:

Q. [Takata's counsel]: Doctor Banks, I'm going to transition to the next area, and that has to do with, um, testimony that has been offered by members of the family in this case, including Dason Udac, that, uh, there was a, uh, bruise on his left shoulder, and I'm gonna ask you a hypothetical.

. . . .

[Hisaka]: . . . I would object on this expert witness making any comments regarding testimony of what's been presented during the trial.

I have no objection to him offering any testimony regarding opinions that he's written in his report, but I think it's improper to be eliciting new opinions at this time, uh, from an expert witness who is obligated to provide a written report, um, of his, uh, expert opinions so what's being elicited right now is not proper.

[Lerma]: I concur, that's the reason why we sequester witnesses.

. . . .

[Takata's counsel]: The information was not offered previously by the family members. It was first offered in court so there's no opportunity to prepare an opinion about, uh, the testimony from the family member.

THE COURT: Okay, and I'm sustaining the objection, the opinions being outside the scope of what was permitted by previous court order.[12]

[Lerma]: Thank you, Judge.

[Takata's counsel]: Your Honor, may we—then I have a request.

THE COURT: Yeah.

[Takata's counsel]: May I ask Doctor Banks what the normal procedure is, given his medical training, in noting bruises re-

---

12. It is not clear from the trial transcript what "previous order" the circuit court was referring to when it sustained the Udacs' objection.

lated to seat belt use in the medical record?

. . . .

THE COURT: I think it's going outside of the area for which he's being, uh, offered as an expert. I understand he's a medical doctor, but, uh, uh okay. So I'm gonna rule that line of questioning will not be allowed.

(Footnote added.)

In his pretrial report, Dr. Banks wrote that Dason's "thoracic[13] injuries occurred during ejection through the sun roof opening and on contact with the terrain following ejection from the sun roof. The reported left-side scrapes, abrasions, and other injuries likely relate to contact with the sun roof frame during ejection." The pre-trial report clearly disclosed Dr. Banks's expert opinion that injuries on Dason's thorax and "scrapes, abrasions, and other injuries" on the left side of Dason's body had resulted from Dason's impact with the sun roof and/or the ground. The report, therefore, encompassed Dr. Banks's proffered testimony, offered to rebut Paul's testimony that the seatbelt had caused bruises and marks on Dason's left shoulder, left hip, and stomach.

■ Use of an expert to comment on or rebut other testimony presented at trial is allowable and expected. *See Porter v. Hu,* 116 Hawai'i 42, 64, 169 P.3d 994, 1016 (App. 2007), *cert. rejected,* 117 Hawai'i 321, 179 P.3d 263 (2008) ("Experts testifying at trial may consider the testimony of other trial witnesses in formulating their own opinions.").

Given the foregoing, the circuit court abused its discretion in precluding Dr. Banks from testifying as to the cause of bruises and marks on Dason's thorax and the left side of Dason's body.

### c. Result

The exclusion of Dr. Banks's testimony by the circuit court denied Takata a fair trial, requiring this court to vacate the Second Amended Judgment. We will, however, address Takata's other points so as to give guidance to the circuit court on remand.

### 2. TK–52 and A–95 patents

Takata maintains the circuit court plainly erred by admitting into evidence the TK–52 and A–95 patents because they were irrelevant. Takata contends "the patents do not in any way tend to show that there is a defect in the TK–821" seatbelt (the TK–821) involved in this case. Takata interprets the patent language to mean

that spring-based buckles use springs that are strong enough to *prevent* inertial release. They [the patents] further explain that the strength of those springs makes it more difficult to release the buckle manually, which may cause annoyance to the user. The novel design elements in the TK–52 and A–95 patents did not address a safety issue with prior-art buckles—there was no safety issue—but allowed the buckles to be manually released with less force, providing a design that is more *convenient* for users.

(Emphases in original; record references omitted.)

The TK–52 patent (the Udacs' Exhibit 1481) provides in relevant part:

2. Description of the Prior Art[14]

Various types of latch buckles have been used to connect or release vehicle seat belts. *Among the desired characteristics*

---

13. *Merriam–Webster's Collegiate Dictionary* 1223 (10th ed.2000) defines "thorax" as "the part of the mammalian body between the neck and the abdomen."

14. *Black's Law Dictionary* 119 (8th ed.2004) defines "prior art" as follows:

prior art. *Patents.* Knowledge that is publicly known, used by others, or available on the date of invention to a person of ordinary skill in an art, including what would be obvious from that knowledge. ● Prior art includes (1) information in applications for previously patented inventions; (2) information that was published more than one year before a patent application is filed; and (3) information in other patent applications and inventor's certificates filed more than a year before the application is filed. The U.S. Patent and Trademark Office and courts analyze prior art before deciding the patentability of a comparable invention. 35 USCA § 102.

for such buckles are the capabilities of being easily done up and easily released by a small operational force, of being maintained in the latch position, even when a high impact force is applied, and of being simple to manufacture at low cost.

Generally, the latch buckles of the prior art have a latch plate having a latching portion that engages the tongue, the latch plate being urged only by spring force to the latched position. When the force required to release the buckle is reduced by decreasing such spring force, so also is the retaining force between the tongue and the latching portion decreased. Thus, when an impact force, such as caused by a vehicle collision, is applied to the seatbelt, the latch plate displaces by an inertial force and releases the tongue from the buckle body. To eliminate such inertial release, the spring force must be very strong, which means an increase in the force required to release the latch plate from the tongue.

In particular, a known seat belt latch buckle has a U-shaped frame having a base and a pair of side walls, a generally L-shaped latch plate pivotably supported by reception of side extensions in triangular-shaped holes in the side walls and having a latching portion engageable with the tongue, a spring urging the latch plate toward the latching position, a release member movable parallel to the frame base and engageable with the latch plate to pivot it out of the latch position and an ejector resiliently urged along the frame base to push the released tongue out of the buckle body. *The spring that holds the latch plate in the latched position has to apply a force great enough to prevent the latch plate from releasing the tongue by being moved by an inertial force in a collision. Accordingly, the force required to move the release member to release the latch plate from the tongue is correspondingly large,* ... [15] *difficulties and annoyance to the user.*

To alleviate this problem, mechanisms are added to lock the latch plate in the latched position when the tongue is inserted. However, known mechanisms are complicated, and some do not positively retain the latch plate.

## SUMMARY OF THE INVENTION

*It is an object of the present invention to provide the latch buckle of the above-mentioned type with a means to lock the latch plate positively in the latched position while retaining ease of operation of the release member with a low force.*

The present invention is characterized in that a control member is slidable on the latch plate between a first position in which it is engaged between a portion of the frame and the latch plate to prevent the latch plate from pivoting from the latched position engaging and holding the tongue and a second position in which it allows pivoting of the latch plate to the tongue-release position, and in that the control member has a portion engageable by the release member so that when the release member is moved to release the tongue, it moves the control member to the second position before it engages the latch plate.

As the control member slides into the latch plate locking position (the first position) after the tongue is inserted into the latch body, and also as the control member is inserted between the frame and the latch plate, the impact force and tongue-pulling force is applied through a flat surface of the control member to the frame. Thus, positive locking of the latch plate in the latched position is very simply accomplished.

. . . .

It will be appreciated that the control member, according to the present invention, is slidably engaged on the latch plate, which pivots or rocks by cooperation with the release member. The control member has two positions, i.e., the pivot-preventing position which maintains the latched posi-

15. Part of the Udacs' Exhibit 1481 is illegible. In its opening brief, Takata states that the miss-   ing words are "which can cause."

tion of the latch plate and the latch plate releasing position. As the control member slides into the pivot-preventing position, the latch plate is positively maintained in the latched position, and the buckle cannot be released by a high impact force or by a high pulling force which is applied by shock or high inertia, such as caused by a collision. *To prevent the inadvertent release, the control member is inserted between the frame member and the latch plate. Thus, a release force is applied only to portions of the control member, and the spring force has no role in keeping the latch plate in the latched position. Thus, the spring 24 which urges the latch plate to the latched position can be relatively weak. Consequently, the operating force to the release member required to release the buckle can be determined from the point of view of making the buckle easy to use.*

(Emphases added; footnotes added.)

The A–95 patent (the Udacs' Exhibit 1482) provides in relevant part:

## BACKGROUND OF THE INVENTION

The present invention relates to a seat belt buckle for a vehicle, such as a car, and more particularly to *a buckle that allows the tongue member to be released with a relatively small force but also prevents the occurrence of inertial fall-out at the time of impact.*

One type of seat belt buckle that was widely used in the past has a lever disposed on a buckle main body that is pivoted to release a tongue member sewn to the belt end from the buckle main body. However, buckles of this type were relatively difficult to use when secured to a stalk adjacent a seat. Therefore, seat belt buckles which allow release of the tongue member from the buckle main body by simply depressing by a fingertip a push button exposed on the front surface of the buckle main body have gained widespread application in place of the lever-operated type. *In these conventional push-button operated buckles, a latch member equipped with a latch projection for engaging a hole in the tongue member is urged by a spring in an anchoring direction. Therefore, if the force of the spring urging the latch member is reduced in order to reduce the force of operation at the time of release, the anchor force between the tongue member and the latch member is also reduced so that when an abnormal impact acts at the time of a vehicle collision, the latch member undergoes displacement due to the force of inertia, and the tongue member is released from the buckle main body. This phenomenon is generally referred to as "inertial fallout." If the force on the spring acting on the latch member is increased, on the other hand, in order to prevent inertial fall-out, the necessary force for the release operation increases, and the release of the buckle becomes difficult.*

*Accordingly, in order to solve the problems of the prior art seat belt buckles of requiring a high releasing force to prevent inertial fall-out at the time of collision, the present inventor has proposed previously a buckle for a seat belt (U.S.Pat. No. 4,575,907, Mar. 18, 1986) in which a control member prevents a latch plate from moving out of a latched position except when a push button is depressed. The control member is slidably carried on the latch plate, and when the release button is not depressed, the latch plate is prevented by the control member from accidentally rotating in a releasing direction due to the force of inertia at the time of collision.*

. . . .

*The buckle of U.S. Pat. No. 4,575,907 is a very good solution to the inertia [sic] fall-out problem and allows the release force to be kept low.* On the other hand the extension portions extend out beyond the outer surface of the frame sides, which increases the overall width of the buckle and requires the buckle case to be configured to allow the extension portions to move within it. Moreover, the several springs involve increased costs for parts and for carrying out the assembly steps to install them.

## SUMMARY OF THE INVENTION

The present invention is a seat belt buckle that embodies the main components

of the buckle of U.S. Pat. No. 4,575,907, as described above, but includes some improvements. The improvements, according to the present invention, comprise a lateral portion along each side of the latch plate, a notch in each such lateral portion, a control projection extending in from each side wall of the frame configured and positioned to be received by the corresponding notch in the latch plate when the latch plate is not in the latched position, and a blocking portion on each side of the control member that closes off the corresponding notch and engages the corresponding control projection to prevent the latch plate from moving out of the latched position when the release button is not depressed. When the release button is depressed, the control member is moved to a position in which the blocking portions are clear of the control projections on the frame sides. A spring interposed between the frame and the release button and control member continuously biases the control member to the blocking position and the release button to the undepressed position. Cam surfaces on the side walls of the frame act on cam follower surfaces on the control plate to move the latch member out of the latched position to the release position when the release button is depressed and thereby moves the control member relative to the cam surfaces.

(Emphases added.)

On November 21, 2005, Takata filed a trial memorandum opposing the admission into evidence of the two patents on the basis that the patents were not related to the TK–821 and the buckles they described were not substantially similar to the TK–821 buckle. Takata noted that Hideo Kitamura (Kitamura), the co-inventor of all three buckles (TK–821, TK–52, and A–95), had stated in his deposition that the TK–821 was not part of the same product line as the TK–52 and A–95

and, therefore, the "prior art" reference in the patents did not apply to the TK–821.

█ On November 21, 2005, the Udacs filed a memorandum in support of the admissibility of the two patents, arguing that the patents were for new seatbelt buckle designs that would prevent inertial release [16] and inadvertent release,[17] design defects that had caused the TK–821 to fail during Dason's accident, and that one could infer from Takata's formulation of the new designs that Takata had been on notice of the TK–821's potential for inertial and inadvertent release.

At trial, over Takata's objections, the circuit court admitted the patents into evidence.

Although we do not reach whether the punitive damages award in this case was excessive, the circuit court's July 20, 2006 "Findings on Defendant Takata Corporation's Claim that the Jury Verdict on Punitive Damages Is Unconstitutionally Excessive" (Findings on Excessive Punitive Damages Claim) reveals that the court found that the language of the TK–52 patent had put Takata on notice, prior to the accident, of the TK–821's potential for inertial and inadvertent release:

1. **Conduct.** Takata's conduct was highly reprehensible. It produced a seatbelt buckle, the TK–821, that suffers from several readily apparent safety defects. Prior to 1987, Takata knew that the TK–821 was susceptible to inertial and inadvertent release. *See, e.g., [the Udacs'] Exh. 1481 (patent application for TK–52);* Kitamura Dep. 10/21/04 Tr. 107:11–19; Kitamura Dep. 11/2/05 Tr. 211:5–212:4; *see also* 11/29/05 p.m. Tr. 54:15–55:13 (Dr. Renfroe testimony).

(Bolding in original; introductory signal emphasis in original; other emphasis added.)

Having carefully reviewed the language of the patents, this court cannot say one way or the other if the patents' reference to "prior

---

16. At trial, Dr. Renfroe testified that "inertial unlatching" or release occurs when a "lateral impact," an impact from the "floor pan" or bottom of the vehicle, or a "sharp vertical acceleration" to the buckle shaft unlatches the seatbelt buckle. The buckle is unlatched, even though nothing has pushed down on the button of the buckle.

17. At trial, Dr. Renfroe testified that "inadvertent unlatching" or release occurs when something, like an elbow, hits the seatbelt buckle's button, unlatching it.

art" included the TK–821. Hence, we cannot hold that the circuit court was wrong to admit the patents into evidence on the basis that the patents did not reference the TK–821, as Takata urges.

With regard to the TK–52, we conclude that the circuit court did not err in admitting that patent into evidence under HRE Rules 401, 402, and 403 for the limited purpose of showing a defect in the TK–821.[18] In particular, the language in the patent that "[h]owever, known mechanisms are complicated, and some do not positively retain the latch plate" may have evinced a defect in the TK–821 that could have resulted in inertial or inadvertent release in this case, as well as Takata's knowledge of such a defect.

On this point, we note that Dr. Renfroe implied in his testimony that the TK–821 buckle was the type of mechanism susceptible to inertial release described in the TK–52 patent:

> Q. [Hisaka] ... [I]s there anything else in this buckle [TK–821 exemplar] that holds that latching dog in the closed position?
>
> A. [Dr. Renfroe] No, that is it. It's just this green piece right here and basically this—there's one on both sides. These little springs these, little leap springs that are kind of wavy, and they are there to—they're what holds this latching dog in the locked position.

■ On the other hand, we conclude the circuit court wrongly admitted the A–95 patent into evidence because it was irrelevant in this case. HRE Rule 401 defines "[r]elevant evidence" as "evidence having any tendency to make the existence of any fact that is of consequence to the determination of the action more probable or less probable than it would be without the evidence." The A–95 patent does not describe a defect in any prior art that would cause the prior art to function unsafely. Rather, the patent merely criticizes the ability of prior art to meet Takata's goal of preserving the ease with which a seatbelt buckle may be released, while at the same time preventing the unwanted release

of a buckle because of inertial forces during an accident.

### a. *Tabieros v. Clark Equip. Co.*

In support of its contention that the circuit court should have excluded the patents from evidence, Takata cites to *Tabieros v. Clark Equip. Co. Tabieros* involved a products-liability action initiated by Tabieros, an employee of Matson Terminals, Inc. (Terminals), against Clark Equipment Company (Clark), following injuries sustained by Tabieros when he was struck by a Series 510 straddle carrier manufactured by Clark, while working at the Sand Island dockyard. 85 Hawai'i at 348–49, 944 P.2d at 1291–92.

The Hawai'i Supreme Court provided the following background regarding the manufacture of the straddle carrier that struck Tabieros:

> Clark manufactured the straddle carrier and sold it to [Matson Navigation, Inc. (Navigation) ] in 1963. The Series 510 straddle carrier was specifically manufactured for, and in part designed by, Navigation, although Clark continued to produce this model for other customers, in addition to Navigation, until 1968. Thereafter, Clark discontinued the manufacture of the Series 510, but replaced it with larger and differently configured straddle carriers that it produced for specialized customers. In approximately 1975, fourteen years before Tabieros's accident, Clark sold its straddle carrier manufacturing business.
>
> Navigation owned and maintained the straddle carrier involved in Tabieros's accident until it was transferred to Terminals in 1973, approximately ten years after it was manufactured and fifteen years before the accident.

*Id.* at 349, 944 P.2d at 1292.

At trial, Tabieros attempted to introduce into evidence a documentary report entitled "Equipment Evaluation: The Operation of Clark Van Carriers" (the NPCR). *Id.* at 380, 944 P.2d at 1323. The NPCR was

> published in February 1973 by an organization—based in London, England—denominated the "National Ports Council."

---

18. HRE Rule 407 has not been raised in this appeal as to any of Udac's claims.

The NPCR purported to be a study, conducted in the ports of Great Britain, of various operational, engineering, structural, and ergonomic characteristics (including driver visibility) of Clark's Series 512, 520, and 521 straddle carriers, the production of which postdated the Series 510 version at issue in this case and which were larger, taller, and otherwise differently configured than the Series 510.

*Id.* (footnote omitted).

Tabieros argued that the NPCR was substantive evidence, relevant to the Series 510 straddle carrier's defective design and Clark's notice thereof. *Id.* Clark sought to exclude the NPCR on the grounds that it was inadmissible hearsay, did not involve the Series 510 carrier, was irrelevant to the notice issue, and was "untrustworthy" on its face. *Id.* The circuit court excluded the evidence as substantive evidence, pursuant to HRE 403, but ruled that experts could refer to the report in their testimonies, to the extent that the parties laid a proper foundation for it. *Id.* at 380–81, 944 P.2d at 1323–24.

On appeal, Tabieros argued that the circuit court had abused its discretion by excluding the NPCR as substantive evidence because "[t]he report went to the basic issues of liability and also to the issue of punitive damages, and the low punitive damage award against Clark shows how extremely prejudiced [Tabieros was] by those decisions." *Id.* at 381, 944 P.2d at 1324 (brackets in original omitted). Tabieros also maintained the "NPCR was relevant to issues of both notice and punitive damages." *Id.* (footnote omitted).

The Hawai'i Supreme Court held, for two reasons, that the circuit court did not err in excluding the NPCR as independent, substantive evidence:

First, the contents of the NPCR constituted inadmissible hearsay, notwithstanding [Tabieros's] attempt at trial to characterize the NPCR as being excepted from the hearsay rule under HRE 803(b)(8)(C) (1993) (the "public records" exception), 803(b)(18) (1993) (the "learned treatise" exception), and 803(b)(24) (1993) (the "catchall" exception).

Second, the findings, conclusions, and recommendations contained in the NPCR were not based on a study of the Series 510 straddle carrier, such as that involved in the present accident; rather, ... the subjects of the NPCR were larger, newer, and structurally different straddle carriers. Thus, the circuit court could rightly have refused to admit the NPCR substantively into evidence on relevance grounds, any references to prior accidents therein lacking "substantial similarity." In any event, for the foregoing reasons, including the multiplicity of straddle carrier types subsumed within the survey (none of which included the Series 510), the acknowledged unreliability of some of the data cited, and the paucity of facts regarding the reported accidents, we hold that the circuit court did not abuse its discretion in refusing, pursuant to HRE 403, to admit the NPCR into evidence.

*Id.* at 381 & 383, 944 P.2d at 1324 & 1326 (citations and footnote omitted).

In the instant case, unlike Tabieros, the Udacs did not seek to admit the patents into evidence to show similar performance characteristics between the TK–52 and A–95 buckles and the TK–821 buckle. Rather, the Udacs sought to admit the patents to show that the TK–821 had a defect, as evidenced by a reference to a defect in "prior art" contained in the patents, and that Takata had "knowledge of the inertial release condition" in the TK–821 seatbelt buckle, but nevertheless sold the seatbelt in 1987, long after Takata was aware of a defect. The fact that the TK–821 buckle is not in the same product line as the TK–52 and A–95 and is "structurally different" does not diminish the patents' probative value.

### 3. 1992 Nissan Design Specifications for the 1992 Nissan Pathfinder (the 1992 NDS)

Takata contends the circuit court erred in admitting the 1992 NDS into evidence because it is irrelevant to this case. Takata maintains, in the alternative, that to the extent the 1992 NDS is relevant, it is cumulative to Nissan Design Specifications

for the 1981 Nissan Pathfinder (the 1981 NDS), which the court admitted into evidence without objection.

### a. Relevance

On appeal, Takata claims the Udacs submitted the 1992 NDS into evidence for the purpose of showing that the TK–821 was defective because it did not pass a 40–millimeter ball-press test (40mm-ball test) [19] required by the 1992 NDS. Takata claims the circuit court erred by admitting the 1992 NDS into evidence because the 1992 NDS did not apply to the 1987 Pathfinder involved in this case and the NDS that did apply, the 1981 NDS, had no 40mm-ball test requirement.

At trial, on November 28, 2005, Hisaka moved to admit into evidence the 1992 NDS. Takata's counsel objected, stating: "[T]his exhibit [Exhibit 1490] is the [1992 NDS] and did not apply to the subject TK–821 buckle. The [1981 NDS] in this case applies to the buckle. We would object on the basis of relevance." Hisaka responded:

[Hisaka]: ... This was the only specifications [sic] that was produced prior to the start of Mr. Kitamura's deposition, and it wasn't until just a little bit later that we learned that there was another earlier version of the same specifications that was produced the night before this particular deposition.

This was the subject of an earlier motion in limine in which the Court said this could be allowed to go to the jury. In addition to that, there is going to be testimony that portions of this are still applicable to the TK–821 that was in fact manufactured and installed in this vehicle, but this is a protected document for the record.

The circuit court admitted the 1992 NDS into evidence, stating that the "Court will recognize that this exhibit is a protected document."

At trial on December 6, 2005, Hisaka stated that he wanted to publish to the jury parts of the 1992 NDS. Takata's counsel

again objected on the basis that the 1992 NDS was irrelevant. Takata's counsel added that the portion of the 1992 NDS Hisaka wanted to publish referenced the 40mm-ball test, and "the ball test was not in existence when the 1987, uh, Pathfinder was sold and when the buckle, the TK–821 buckle, was designed and installed in the subject vehicle." The court allowed publication over Takata's counsel's objection.

It is undisputed that Takata actually conducted a 40mm-ball test on the TK–821, which test the TK–821 failed. The 1992 NDS was relevant as to whether Takata had notice of the TK–821's potential for inadvertent release after the 1992 NDS was issued and did nothing in response, which went to whether the Udacs should be awarded punitive damages.

In so holding, we recognize that pursuant to HRE Rule 407, the 1992 NDS would not have been admissible as evidence of a "subsequent remedial measure." *See* HRE Rule 407 ("When, after an event, measures are taken which, if taken previously, would have made the event less likely to occur, evidence of the subsequent measures is not admissible to prove negligence or culpable conduct in connection with the event.").

The circuit court was not wrong to admit the 1992 NDS into evidence.

### b. Cumulativeness

■ Takata maintains that to the extent the 1992 NDS is relevant, it is cumulative to the 1981 NDS the circuit court admitted into evidence without objection. Clearly, because the 1992 NDS contained the 40mm-ball test requirement and the 1981 NDS did not, the former was not cumulative of the latter. The circuit court did not abuse its discretion by admitting the 1992 NDS into evidence.

### 4. Latent danger theory of product defect and negligent failure to warn jury instructions

■ Takata argues that the circuit court erroneously instructed the jury on the latent

---

**19.** The 40mm-ball test is conducted by pressing a 40–millimeter–diameter ball against a seatbelt buckle release button to determine if such pressure will cause the belt to release. The test is used to evaluate button operability and inadvertent release.

danger theory of defect (latent danger) and negligent failure to warn (failure to warn) because "any warning regarding the defects that [the Udacs] claimed Takata knew about clearly would have been futile" in this case because a failure to warn could not have been the cause of Dason's injuries.

■■ "A plaintiff may establish a defect for . . . negligence under . . . the 'latent danger' test." *Acoba v. Gen. Tire, Inc.*, 92 Hawai'i 1, 17, 986 P.2d 288, 304 (1999). The latent danger test requires a manufacturer to give adequate warnings of a known danger. *Tabieros*, 85 Hawai'i at 370, 944 P.2d at 1313. "[I]n order for a manufacturer to be liable for failing to provide an appropriate warning, it must not only be subject to a legal duty to warn, but the breach of that duty (*i.e.*, the failure to give an adequate warning) must have been the legal cause of the plaintiff's injuries." *Id.*

With regard to failure to warn, the Hawai'i Supreme Court has stated that "a manufacturer must give appropriate warning of any known dangers which the user of its product would not ordinarily discover." *Acoba*, 92 Hawai'i at 18, 986 P.2d at 305 (internal quotation marks and citation omitted).

The circuit court gave the following jury instruction on latent danger:

Under the latent defect test, you may find the product defective if [the Udacs] prove the following:

1. Even if faultlessly made, the use of the product in a manner that is intended or reasonably foreseeable, involves a substantial danger;

2. The manufacturer knew about the danger;

3. The danger would not be readily recognized by the ordinary user or consumer of the product; and

4. The manufacturer failed to give adequate warnings of the danger or adequate instructions for safe use.

(Quotation marks omitted.)

The circuit court's instruction on failure to warn provided: "It is the duty of manufacturers to exercise reasonable care in the design of its [sic] product to protect against foreseeable danger. A manufacturer must give appropriate warnings of any known dangers which the user of its products would not ordinarily discover."

Takata contends the Udacs failed to show that a failure to warn legally caused Dason's injuries. Takata maintains that even if the TK–821 had a potential for inertial and inadvertent release and Takata had a duty to warn Dason about such, which duty Takata failed to fulfill, there was nothing Dason could have done as a result to prevent his injuries. We agree. At trial, the Udacs presented no evidence that a failure to warn in any way caused Dason's injuries. For example, Dason did not testify that if he had been cautioned about a defect, he would have replaced the TK–821 seatbelt, decided to drive a different vehicle, or otherwise altered his behavior.

Further, "[t]o support a jury instruction, there must be sufficient evidence presented on that issue of fact." *Masaki v. Gen. Motors Corp.*, 71 Haw. 1, 26, 780 P.2d 566, 580 (1989). Because the Udacs presented no evidence that Takata's failure to warn in any way caused Dason's injuries, the subject jury instructions were not supported by "sufficient evidence" on those issues.

Last, the jury instructions contradicted the circuit court's earlier ruling that the Udacs could not present latent danger and failure to warn as separate causes of action. On September 26, 2005, Takata filed a Motion for Partial Summary Judgment on All Warning Claims, arguing that the Udacs had "entirely failed to pursue any warning claim in this action" and, hence, there was no genuine issue of material fact with regard to Takata's alleged failure to warn.

At a hearing on the motion on October 21, 2005, Hisaka admitted that the Udacs had not asserted lack of warning "in and of itself as being a basis for an independent claim." Accordingly, the circuit court granted Takata's summary judgment motion on all warning claims, with the following limitation:

THE COURT: Okay. So, [Takata's counsel], I'll grant the motion to that extent then. He [Hisaka] has admitted it [lack of warning] is not going to be a part of an independent claim in and of itself. It

may be part of proof of a separate claim for whatever they want to advocate. In other words, it could—I don't want the ruling to mean that he's gonna preclude—be precluded from bringing up warning issues as opposed to add an argument saying it's an independent claim and his client would be, uh, entitled for compensation.

The circuit court later stated:

THE COURT: Just to expedite matters, what I'm going to do is I'm going to, as I indicated, grant the motion to the extent that [Hisaka] has indicated that he is not relying on the failure to warn as an independent basis to assert a recovery. However, he is not precluded from raising that issue as part of his proof of any other theory of recovery.

Despite the circuit court's ruling, in its jury instructions the court did not prohibit the jury from considering latent danger or failure to warn as an independent cause of action.

The circuit court plainly erred by giving the jury instructions on latent danger and failure to warn.

#### 5. False latch

Takata argues that the circuit court erred by denying the portion of Takata's JMOL Motion in which Takata requested JMOL because the Udacs failed to present sufficient evidence for their false-latch theory. Takata claims the Udacs failed to produce any evidence that a false-latch defect in the TK–821 caused Dason's injuries and, hence, failed to show that the alleged defect was a "legal cause" of Dason's injuries. *See Tabieros*, 85 Hawai'i at 354, 944 P.2d at 1297.

On December 19, 2005, Takata filed its JMOL Motion. Among other things, Takata argued that it was entitled to JMOL on the Udacs' product defect claims, in part, because the Udacs presented no expert testimony in support of their false-latch[20] theory, i.e., the theory that a false-latch defect in the TK–821 caused Dason's injuries. Takata maintained the Udacs failed to meet their

burden of proving "by a preponderance of the evidence that the [TK–821] buckle *was* defective in design and that the alleged defect *was* the legal cause of [Dason's] injuries. (Emphases in original.) *See [Tabieros*, 85 Hawai'i at 354, 944 P.2d at 1279]."

Takata does not identify the order or ruling in which the circuit court denied Takata's JMOL Motion, and we find none. Nevertheless, the circuit court allowed the issue to go to the jury.

■ We conclude that, disregarding conflicting evidence and giving to the Udacs' evidence "all the value to which it is legally entitled, and indulging every legitimate inference which may be drawn from the evidence in [the Udacs'] favor," *Miyamoto v. Lum*, 104 Hawai'i 1, 7, 84 P.3d 509, 515 (2004) (quoting *Wakabayashi v. Hertz Corp.*, 66 Haw. 265, 271, 660 P.2d 1309, 1313 (1983)), there was evidence that could have supported a jury verdict that a defect in the TK–821 caused Dason's injuries, based on a false-latch theory.

The Udacs produced evidence of a false-latch defect in the TK–821. Dason testified that it was his habit to always fasten his seatbelt and he had fastened and was wearing his seatbelt prior to the accident. Ikaika also testified that Dason had fastened Dason's seatbelt. There was no dispute that Dason was ejected from his vehicle at some point during the accident and that if Dason had been wearing his seatbelt at the time of the accident, the seatbelt would have remained fastened if correctly designed. From these facts, the jury could have properly inferred that a false-latch defect in the TK–821 caused Dason's injuries.

The circuit court did not err by denying the portion of Takata's JMOL Motion pertaining to the Udacs' false-latch theory.

#### 6. Punitive Damages

■ Takata contends the circuit court erroneously denied the portion of Takata's JMOL Motion in which Takata requested JMOL because the punitive damages award was based on insufficient evidence. Takata

---

**20.** At trial, Dr. Renfroe testified that "false latch" occurs when one inserts the tongue into the buckle and the buckle appears to have latched, but comes undone when it is jerked.

maintains "there was *no* evidence—let alone clear and convincing evidence—that Takata either knew of a defect in the TK–821 or was consciously indifferent to whether the TK–821 was safe." (Emphasis in original.)

In its JMOL Motion, Takata argued that Count VI (Punitive Damages) of the Udac's complaint necessarily failed because the Udacs

> failed to proffer legally sufficient evidence for a reasonable jury, applying the law, to find by *clear and convincing* evidence, that Takata's conduct was wilful, wanton, oppressive, malicious, or demonstrated a positive element of conscious wrongdoing. In short, there is not [sic] legally sufficient evidentiary basis upon which a reasonable jury, applying the law, could find in favor of [the Udacs] on their claim for punitive damages against Takata.

(Emphasis in original.)

Takata does not identify the order or ruling in which the circuit court denied the JMOL Motion, and we find none. Nevertheless, in its Findings on Excessive Punitive Damages Claim, the circuit court upheld the jury's punitive damages verdict.

In *Masaki*, the Hawai'i Supreme Court stated the following with regard to punitive damages:

> Punitive or exemplary damages are generally defined as those damages assessed in addition to compensatory damages for the purpose of punishing the defendant for aggravated or outrageous misconduct and to deter the defendant and others from similar conduct in the future. D. Dobbs, *Handbook on the Law of Remedies*, § 3.9, at 204 (1973); *Restatement (Second) of Torts* § 908 (1979). Thus, the practice of awarding punitive damages is an exception to the general rule that damages are aimed at compensating the victim for his injuries. C. McCormick, *Handbook on the Law of Damages* § 77, at 275 (1935).
>
> Since the purpose of punitive damages is not compensation of the plaintiff but rather punishment and deterrence, such damages are awarded only when the egregious nature of the defendant's conduct makes such a remedy appropriate. Thus, "[w]here the

defendant's wrongdoing has been intentional and deliberate, and has the character of outrage frequently associated with crime, all but a few courts have permitted the jury to award ... [punitive damages.]" W.P. Keeton, *Prosser & Keeton on the Law of Torts* § 2, at 9 (5th ed.1984); *Restatement (Second) of Torts* § 908, comment b. While the concepts of punishment or deterrence usually do not enter into tort law, in this "one rather anomalous respect ... the ideas underlying the criminal law have invaded the field of torts." *Prosser & Keeton, supra,* at 9.

In determining whether an award of punitive damages is appropriate, the inquiry focuses primarily upon the defendant's mental state, and to a lesser degree, the nature of his [or her] conduct. Dobbs, *supra,* at 205.... [T]o justify an award of punitive damages, "a positive element of conscious wrongdoing is always required." [McCormick, *supra,* at 280.] Thus, punitive damages are not awarded for mere inadvertence, mistake, or errors of judgment. *Restatement (Second) of Torts* § 908, comment b; *Prosser, supra,* at 10. "Something more than the mere commission of a tort is always required for punitive damages." *Prosser,* at 9.

> . . . .

Despite its critics, the punitive damages doctrine has remained firmly established in the common law. "[T]he doctrine of punitive damages survives because it continues to serve the useful purposes of expressing society's disapproval of intolerable conduct and deterring such conduct where no other remedy would suffice." Mallor & Roberts, *Punitive Damages: Toward a Principled Approach,* 31 Hastings L.J. 639, 641 (1980). While "[a]n award of compensatory damages may be sufficient when injury has resulted from well-intentioned, but poorly advised behavior[,] when the defendant's conduct can be characterized as malicious, oppressive, or otherwise outrageous, a stronger sanction is needed." *Id.* at 648. Imposing punitive damages "effectively expresses to the defendant that such conduct will not be tolerated." *Id.* In such circumstances, utilizing "the civil law to shape social behavior is both logical and

desirable." [*Tuttle v. Raymond*, 494 A.2d 1353, 1356 (Me.1985).]

71 Haw. at 6–9, 780 P.2d at 570–71.

The supreme court went on to adopt, for all punitive damages claims,

> the clear and convincing standard of proof. The plaintiff must prove by clear and convincing evidence that the defendant has acted wantonly or oppressively or with such malice as implies a spirit of mischief or criminal indifference to civil obligations, or where there has been some wilful misconduct or that entire want of care which would raise the presumption of a conscious indifference to consequences.

*Id.* at 16–17, 780 P.2d at 575.

In construing the "clear and convincing" standard, the supreme court stated that

> "clear and convincing" evidence may be defined as an intermediate standard of proof greater than a preponderance of the evidence, but less than proof beyond a reasonable doubt required in criminal cases. It is that degree of proof which will produce in the mind of the trier of fact a firm belief or conviction as to the allegations sought to be established, and requires the existence of a fact be highly probable. *See Welton v. Gallagher*, 2 Haw.App. 242, 245–46, 630 P.2d 1077, 1081 (1981); *Bud Wolf Chevrolet, Inc. v. Robertson*, 519 N.E.2d 135, 138 (Ind.1988); [E. Cleary, *McCormick on Evidence*, § 340, at 959–60 (3d ed.1984)].

As one court explained:

> [C]lear and convincing proof is a standard frequently imposed in civil cases where the wisdom of experience has demonstrated the need for greater certainty, and where this high standard is required to sustain claims which have serious social consequences or harsh or far reaching effects on individuals to prove willful, wrongful and unlawful acts to justify an exceptional judicial remedy. . . .
>
> So, in a number of cases where an adverse presumption is to be overcome, or on grounds of public policy and in view of peculiar facilities for perpetrating injustice by fraud or perjury, the degree of proof required is expressed in such terms as . . . 'clear and convincing' . . . and the phrase 'preponderance of the evidence' has been expressly disapproved as an insufficient measure of the proof required[.]

*Travelers Indemnity Co. v. Armstrong*, 442 N.E.2d 349, 360 (Ind.1982).

*Id.* at 15–16, 780 P.2d at 574–75.

In the instant case, then, to establish all of the necessary elements for an award of punitive damages, the Udacs were required to "prove by clear and convincing evidence that [Takata] has acted wantonly or oppressively or with such malice as implies a spirit of mischief or criminal indifference to civil obligations, or where there has been some wilful misconduct or that entire want of care which would raise the presumption of a conscious indifference to consequences." *Id.* at 16–17, 780 P.2d at 575.

The circuit court's Findings on Excessive Punitive Damages Claim reveals what the court found the Udacs had shown by clear and convincing evidence:

> [T]his court makes the following findings. In so doing, it reviews the record "in the light most favorable to [the Udacs]" to determine what facts the jury could reasonably have found by clear and convincing evidence. . . . Further, in its review, this Court applies the federal due process "guideposts" *de novo*. *State Farm Mut. Life Ins. Co. v. Campbell*, 538 U.S. 408, 418 [123 S.Ct. 1513] (2003).[21]

21. In *State Farm Mut. Auto. Ins. Co. v. Campbell*, 538 U.S. 408, 418, 123 S.Ct. 1513, 1521, 155 L.Ed.2d 585 (2003), the United States Supreme Court stated the following with regard to the guideposts:

> [I]n [*BMW of North America, Inc. v. Gore*, 517 U.S. 559, 116 S.Ct. 1589, 134 L.Ed.2d 809 (1996)], we instructed courts reviewing punitive damages to consider three guideposts: (1) the degree of reprehensibility of the defendant's misconduct; (2) the disparity between the actual or potential harm suffered by the plaintiff and the punitive damages award; and (3) the difference between the punitive damages awarded by the jury and the civil penalties authorized or imposed in comparable cases. *Id.* at [574–75], 116 S.Ct. [at 1598–99]. We reiterated the importance of these three

1. Conduct. Takata's conduct was highly reprehensible. It produced a seatbelt buckle, the TK–821, that suffers from several readily apparent safety defects. Prior to 1987, Takata knew that the TK–821 was susceptible to inertial and inadvertent release. *See e.g.*, [the Udacs'] Exh. 1481 (patent application for TK–52); Kitamura Dep. 10/21/04 Tr. 107: 11–19; Kitamura Dep. 11/2/05 Tr. 211:5–212:4; *see also* 11/29/05 p.m. Tr. 54:15–55:13 (Dr. Renfroe testimony). It nevertheless supplied the [seatbelt] for installation into Dason Udac's Nissan Pathfinder, even though it had another product available that it believed was safer. *See* [the Udacs'] Exh. 1481. Compounding the reprehensibility of its actions, Takata continued to receive information after the TK–821's installation that confirmed that its product was defective. For years, Takata did nothing in response. *See* Exh. 1490, at 00350 (1992[NDS]); Kitamura Dep. 11/2/05 Tr. 217:15–22; Defendant Takata Corporation's Response to Plaintiffs Dason Udac and Alfredo Udac's Second Request for Answers to Interrogatories and Second Request for Production of Documents and Things to Defendant Takata Corporation, Dated August 24, 2006 dated September 23, 2005, Interrogatory Answer No. 4 (*Emmert* Complaint [22]).

(Footnote added.)

Hence, in its Findings on Excessive Punitive Damages Claim, the circuit court found that there was clear and convincing evidence that "[p]rior to 1987, Takata knew that the TK–821 was susceptible to inertial and inadvertent release." The circuit court based its finding on several factors, including the TK–52 patent application, Kitamura's deposition testimony, Dr. Renfroe's testimony, the 1992 NDS, and the *Emmert* Complaint.

### a. Sufficiency of evidence

#### (i) The TK–52 patent

We have carefully considered the language of the TK–52 patent, along with Dr. Renfroe's and Kitamura's deposition testimony regarding it. The TK–52 patent criticizes the ability of "prior art" to meet Takata's goal of preserving the ease with which a seatbelt buckle may be released, while preventing the unwanted release of a buckle because of inertial forces during an accident. Although the language in the TK–52 patent could have supported a verdict that a "preponderance of the evidence" showed the TK–821 had a defect that resulted in inertial and/or inadvertent release during the crash, it could not have "clearly and convincingly" established that Takata had prior knowledge of such a defect. *See Masaki*, 71 Haw. at 16–17, 780 P.2d at 575.

#### (ii) Dr. Renfroe's testimony

Dr. Renfroe's testimony regarding his test results did not provide clear and convincing evidence that Takata consciously or recklessly disregarded knowledge of a defect in the TK–821. Dr. Renfroe testified at length regarding his testing and opinion of the TK–821 seatbelt buckle, but did not testify that Takata had notice or should have known of a defect in the TK–821.

#### (iii) The 1992 NDS

In their answering brief, the Udacs argue that the 1992 NDS gave Takata notice that the TK–821 buckle was defective and because Takata did nothing in response to that notice, Takata acted reprehensibly. However, it is difficult to see how the jury could have found clear and convincing evidence in the 1992 NDS that Takata knew or should have known the TK–821 was defective. The 1992 NDS did not make the 40mm-ball test re-

guideposts in *Cooper Industries[, Inc. v. Leatherman Tool Group, Inc.,* 532 U.S. 424, 435, 121 S.Ct. 1678, 1684–85, 149 L.Ed.2d 674 (2001),] and mandated appellate courts to conduct *de novo* review of a trial court's application of them to the jury's award. 532 U.S. [at 436], 121 S.Ct. [at 1685–86]. Exacting appellate review ensures that an award of punitive damages is based upon an "application of law,

rather than a decisionmaker's caprice." *Id.* at 436, 121 S.Ct. [at 1685] (quoting *Gore, supra,* at 587, 116 S.Ct. [at 1605] (BREYER, J., concurring)).

**22.** The circuit court refers to the complaint filed in *Emmert v. Nissan Motor Corporation in U.S.A., et al.,* No. 57154, on April 5, 1996 in the Iowa District Court in and for Johnson County.

quirement retroactive or even require that replacement parts for pre–1992 vehicles meet the requirement. Furthermore, when Nissan issued the 1992 NDS, the TK–821 had been in use in millions of vehicles around the world for almost ten years and in the Pathfinder for five years and Takata had not received a single report of its failure, including inadvertant release.

The 1981 NDS, which was in effect when Nissan installed the TK–821 seatbelt assembly in the Udacs' Pathfinder in 1987, did not require that seatbelt buckles pass the 40mm-ball test. It is undisputed that the TK–821 met all of the 1981 NDS specifications.

Given the foregoing, although there may have been a preponderance of the evidence that the TK–821 was defective, the 1992 NDS does not provide clear and convincing evidence that Takata had notice of such.

### (iv) *Emmert* Complaint

The circuit court cites to the *Emmert* Complaint as evidence the jury could have relied on to find notice. On appeal, Takata argues the circuit court erred by relying on the *Emmert* Complaint in finding Takata had notice of a defect in the TK–821. Takata maintains the Udacs' complaint did not provide any evidence that Takata knew of or should have known of a defect in the TK–821 based on a single, isolated allegation.

At trial, on December 8, 2005, the circuit court allowed the Udacs to publish to the jury part of interrogatory question # 4 from the Udacs' Second Request for Production of Documents and Things and Takata's answer to the question for the purpose of impeaching Kitamura's deposition testimony. The circuit court read the published part of the question and answer into the record:

> [THE COURT:] "Has Takata ever received any claim [sic] for design defects or manufacturing defects [sic] for the TK82—821 buckle … [?]"
>
> . . . .
>
> [THE COURT:] "In addition to the instant lawsuit, Plaintiff referred to the Complaint in *Emmert v. Nissan, et al.,* produced as T149–164. In addition, [the

Udacs] have referred to the lawsuit referenced by Mr. Kitamura in his deposition, however no documents are available."

After carefully reviewing the record on appeal, we have not found where the Udacs introduced the *Emmert* Complaint into evidence. However, Takata attached a copy of the *Emmert* Complaint to its Motion in Limine # 4, filed on October 24, 2005. Paragraphs 11 and 12 of the *Emmert* Complaint provide:

> 11. Prior to the accident, Plaintiff [Dixie Emmert] was properly utilizing her seat belt restraint system, as was her daughter, Jessie Emmert, who was a front-seat passenger in the Pathfinder.
>
> 12. At a point during the accident, Plaintiff's seat belt restraint system failed and did not restrain Dixie Emmert in her seat, resulting in severe injury to Dixie Emmert.

The complaint states that the vehicle involved in the *Emmert* accident was a 1987 Nissan Pathfinder and Takata had designed and manufactured the seatbelt system used in the vehicle, but does not specify which model of seatbelt was installed in the vehicle.

The circuit court's reliance on allegations contained in the *Emmert* Complaint, which was inadmissible hearsay, to uphold the jury's punitive damages award was erroneous because the unsubstantiated allegations contained therein fall far short of clear and convincing evidence that Takata had notice of a defect in the TK–821. The weight of the *Emmert* Complaint, viewed in a light most favorable to the Udacs, is that of a single, admittedly unproven allegation that there was a defect in a TK–821 seatbelt buckle.[23] As Takata points out in its opening brief, "the fact that only one person has ever arguably alleged that the TK–821 failed to operate properly in the last 20 + years—during which the TK–821 has been installed in millions of vehicles around the world—is powerful evidence that the seatbelt is *not* defective." (Emphasis in original.)

---

**23.** There is nothing in the record indicating how the *Emmert* Complaint was resolved.

### (v) Result

Taken together, the factors on which the circuit court based its finding that Takata knew the TK–821 was susceptible to inertial and inadvertent release do not amount to clear and convincing evidence that Takata had notice of such susceptibility, yet acted with an "entire want of care which would raise the presumption of a conscious indifference to consequences." *Masaki*, 71 Haw. at 17, 780 P.2d at 575. For the foregoing reasons, we conclude the circuit court abused its discretion in denying the portion of Takata's JMOL pertaining to the punitive damages award.

### b. Whether award excessive

Takata argues that the circuit court erroneously denied the portion of Takata's Renewed JMOL Motion in which Takata argued that the jury's $12,500,000 punitive damages award was excessive under Hawai'i law and the federal due process clause. Because we hold that the circuit court abused its discretion by awarding the Udacs punitive damages, we need not address this issue.

### B. The Udacs' Cross–Appeal

The Udacs contend the circuit court erroneously failed to award them prejudgment interest on (1) compensatory damages from the date of the accident and (2) the punitive damages award. Because we vacate the Second Amended Judgment and remand this case, these points are moot.

### IV.

We vacate the Second Amended Judgment and remand this case to the circuit court for further proceedings consistent with this opinion.